**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| DR. SEMA ROSINBUM, MD, Ph.D., <br> 1425 Clifton St. NW <br> Washington DC. 20009 <br><br>       Plaintiff, <br><br> v. <br><br> ALEX M. AZAR, II, Secretary <br> Department of Health and Human Services <br> 200 Independence Avenue, S.W. <br> Washington, D.C. 20201 <br><br>       Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )  Civil Action No. _____ <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**COMPLAINT OF
UNLAWFUL EMPLOYMENT DISCRIMINATION**

1. Plaintiff, Sema Rosinbum, by and through her undersigned counsel, respectfully submits this complaint against Defendant Alex Azar in his capacity as Secretary, U.S. Department of Health and Human Services, for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., including unlawful discrimination based on sex, religion and national origin, and reprisal for engagement in protected activity - complaining about discrimination internally and subsequently filing an Equal Employment Opportunity (EEO) complaint against her federal government employer, the United States Food and Drug Administration, an agency within the U.S. Department of Health and Human Services.

**I. THE PARTIES**

2. Plaintiff Dr. Rosinbum is a Muslim, Turkish-American woman. She is currently a resident of Washington DC. Beginning on May 8, 2006, Dr. Rosinbum was employed as ORISE fellow by the Defendant. She was later employed as Staff Fellow, GS-401-12 in the Cellular and Tissue Therapy Branch, Division of Cellular and Gene Therapies, Office of Cellular Tissue and Gene Therapies, Center for Biologics and Evaluation Research, U.S. Food and Drug Administration (FDA), U. S Department of Health and Human Services. She held that position from 2009 until November 2, 2016.

3. Defendant Alex Azar is the Secretary of the U.S. Department of Health and Human Service, the parent Agency of the FDA, and therefore the chief executive officer of the Department, which employed the Plaintiff. It has its headquarters in the District of Columbia.

## II. JURISDICTION AND VENUE

4. This Court has federal question, subject matter jurisdiction over this claim, pursuant to 28 U.S.C. § 1131, because Plaintiff's claim arises under federal law, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.

5. Plaintiff has exhausted her Administrative Remedies. She filed a Formal Complaint with the EEOC Baltimore Field Office on December 13, 2017. After many months she withdrew her hearing request, and on February 4, 2019 the EEOC issued an Order directing the Agency to issue a Final Agency Decision within 60 days. To date there has been no Final Agency Decision issued.

6. Venue is proper within the District of Columbia, pursuant to 28 U.S.C. § 1391, because Defendant Agency has its headquarters in the District of Columbia, and because the Plaintiff lives in the District of Columbia.

## III.  FACTS GIVING RISE TO THIS COMPLAINT

A.  Harassment and Discrimination

8.  Dr. Rosinbum MD, PhD, was employed as Staff Fellow, GS-401-12 in the Cellular and Tissue Therapy Branch (CTTB), Division of Cellular and Gene Therapies (DCGT), Office of Cellular Tissue and Gene Therapies (OCGT), Center for Biologics and Evaluation Research, U.S. Food and Drug Administration, U. S Department of Health and Human Services.

9.  Her first line supervisor for most of the time relevant to this complaint was Dr. Malcolm Moos, Jr., M.D., PhD., Medical Officer under Title 42, assigned to CTTB since 1996. Her second-line supervisor was Dr, Steven Bauer, PhD, Supervisory Biologist, GS-15, and has been at CTTB for over 15 years.  Her third line Supervisor was Dr. Raj Puri, M.D., PhD., Director, Title 42 of DCGT, who has served in that position for approximately 15 years. Beginning sometime in November 2015, Dr. Kyung Sung was assigned as Dr. Rosinbum's first line supervisor, and remained so through Dr. Rosinbum's removal in Nov, 2016.

10.  Sometime in 2009, after learning that Dr. Rosinbum was getting a divorce from her husband, Dr. Malcolm Moos, her first-line supervisor at the time, began showing an interest in her socially.  He asked her to go to events or dinner on several occasions.  She agreed on several occasions, once to go together to an event at a winery they had both been separately invited to, and two times to a "working" dinner after a long work day.  However, when Dr. Moos' made clear his intent that the relationship become romantic and/or sexual, Dr. Rosinbum told him she felt uncomfortable and refused all future requests from Dr. Moos to see him socially or outside of work functions.  Dr. Moos expressed his disappointment, and his attitude toward Dr. Rosinbum changed.

11. In 2010, during Dr. Rosinbum's first "PMAP" performance evaluation, Dr. Moos inquired about Dr. Rosinbum's personal goals. Dr. Rosinbum was uncertain what he meant, but when pressed, she advised him that she was considering becoming pregnant before it becomes to late. Dr. Moos reacted very negatively to this and said in a raised voice words to the effect of, "You cannot be pregnant in my Lab!"

12. On May 29, 2013 and August 11, 2013, Dr. Rosinbum witnessed Dr. Moos an Oak Ridge Institute for Science and Education (ORISE) Fellow (a female, Alexa Bianchi) engage in inappropriate physical conduct, and this misconduct carried on at work and outside of work until Ms. Bianchi left the CTTB. It was also known to other employees in OCGT, and their inappropriate conduct was witnessed and reported to Dr. Puri by multiple people including Susan Roman, and Ian Bellayr, two other OCGT employees.

13. After trying to invite (without success – all declined) his female subordinates to a seminar on July 2013 in North Carolina, he made another attempt on November 20, 2013. Dr. Malcolm Moos invited only subordinate female employees, including Dr. Rosinbum, to an overnight training event in North Carolina which was not sponsored by the FDA, and unrelated to their work or profession (it was designed for stock traders). The training was entitled, "Oneness Awakening Course," put on by an organization called the Van Tharp Institute. Dr. Rosinbum refused to go because it was not work related, and she was apprehensive about traveling with Dr. Moos. Thereafter, Dr. Moos started to accuse Dr. Rosinbum of "not getting along with others," and his attitude toward her in the workplace worsened significantly.

14. On January 31, 2014, during Dr. Rosinbum's performance review (which was scheduled by Dr. Moos to started at 5 pm on Friday night, and ended at 9 pm) Dr. Moos continued to inject his personal beliefs and force her to be involved activities which are not

related to her work responsibilities.  When she informed him that she was not under an obligation to respond to his personal beliefs or do anything outside of her work responsibilities, he waived a copy of her performance review in the air while stating, "Yes, you are," or words to that effect.  The clear implication was that failing to respond to his personal requests would have a negative impact on her performance rating.  Further, Dr. Moos had a different, and questionable, method for conducting PMAP evaluations for years.  No research projects or program activities were discussed during Dr. Rosinbum's PMAP meetings.  Instead, Dr. Moos required her to plug her fingers into electrodes and close her eyes to see if she was able to relax using biofeedback.     At this point Dr. Rosinbum made a complaint to Dr. Raj Puri, the Division Chief (Dr. Moos' second level supervisor), about the request to travel to the Van Tharp Institute training, and the consequences on her PMAP evaluation and other matters in April 11, 2014.  Dr. Moos subsequently received an email from his supervisors on June 5th 2014, advising him of the need to keep his relationships with his staff, "professional at all times."  Because the other two employees had agreed to go, this email left no doubt who had complained about Dr. Moos to his superiors.

15.  After Dr. Moos received this email his controlling and forceful behaviors with Dr. Rosinbum continued and intensified about whether she would take the Oneness Awakening Workshop in NC, July 12-13, 2014. On June, 2014,Dr. Rosinbum was assigned to represent FDA in a scientific industry meeting in Boston. She asked Dr. Moos for help with the presentation by sharing his slides. He replied that he would only help her preparing her talk and sharing his slides if she would agree to go to the Oneness Awakening Workshop in NC. Ultimately, Dr. Rosinbum felt she had to take required Oneness Awakening leave Workshop in order to not jeopardize her career. Dr. Rosinbum used her annual leave and spent $500 cover the

expenses from her own pocket to take the training. Unfortunately, Dr. Moos attitude toward Dr. Rosinbum did not improve, and he continued to isolate her.

16. Dr. Rosinbum faced personal questions and statements from Dr. Moos throughout the period she was working under him, such as:

1. "If Muslims are not responsible from terrorist attack, why doesn't 'Muslim society' apologize to the US?"
2. "I understand not all Muslims are terrorist but why are all terrorists Muslim?"
3. During her 2010 PMAP, Dr. Moos, asked Dr. Rosinbum about her personal goals. When she told him she was considering becoming pregnant, he told her she could not be pregnant while working in his laboratory, and that her pregnancy can cause her not to be converted to a permanent position.
4. Dr. Moos often made derogatory and humiliating comments at Dr. Rosinbum's expense. For instance he publicly referred to her as a "Grandma" because her dress was of a conservative style. In another incidence he referred to her as one of his cats called Boomer in front of other employees. This name is a reference to a cat he calls fat and that does not get along with the other cats.
5. Dr. Moos sexual harassment to other employees was also noticed. Orise fellow Hannah Xu brought her special complaint to Dr. Rosinbum complain about Dr.Moos was making sexual advances to her and making her very uncomfortable. Dr. Rosinbum made her calm but in an attempt to keep the peace, convinced her not to complain. This occurred in 2008 and prior to Dr. Rosinbum becoming a target for Dr. Moos.
6. Dr. Moos multiple times made inappropriate comments about our Summer student Lina Chu. A notable example was; " God she is so hot, I know she is in high school, but I want to take her to bed" (2011)

B. Retaliation

17. Between the time Dr. Rosinbum first reported Dr. Moos' inappropriate behavior, on or about August 13, 2013, until April, 2014, no action was taken by Dr. Bauer, Dr. Moos' direct supervisor. This, even though Dr. Bauer was one of the first people to notice the inappropriate

relationship, commenting "Malcolm lost his mind about his new ORISE fellow Alexa Bianchi. I hope this would not become an issue in the division," during a conversation with one of his employees.

18. On July 22, 2014, Dr. Raj Puri, OCGT Division Director promised to reassign Dr. Rosinbum to a different lab, but the lab had no assigned PI at the time, so Dr. Rosinbum could not move. Therefore, Dr. Rosinbum was still reporting to Dr. Moos until March 2015, when suddenly, without notice, her laboratory workbench in Dr. Moos' laboratory was totally dismantled and moved into the hallway. After this, she was temporarily assigned to report to Dr. Bauer.

19. From the period of March 11, 2015 to November 20, 2015, Dr. Bauer made no attempt to either supervise or advise Dr. Rosinbum with her daily work. During this period, Dr. Rosinbum was effectively on her own and shut out from the rest of the division. Dr, Rosinbum appealed to Dr. Bauers' supervisor, who approved a research project she proposed. However, Dr. Bauer effectively prevented her from working on this project by assigning her other, non-research activities normally performed by a lab technician, not a scientist of her expertise and skill. On November 20, 2015, Dr. Rosinbum was assigned to report to Dr. Sung. In retrospect, it is clear that Dr. Bauer made the assignment in order to set Dr. Rosinbum up for failure. This is supported by Dr. Sung explicitly telling Dr. Rosinbum, "You were not my choice to pick to work in my lab."

20. In addition, Dr. Sung misinformed Dr. Bauer about her performance, such as stating that Dr. Rosinbum did not presented in any lab meetings and had failed to attend lab meetings. In fact, Dr. Rosinbum missed only one lab meeting due to extenuating circumstances, and when Dr. Sung made this untruthful report to Dr. Bauer and Dr. Puri, Dr. Rosinbum had already made 3

more presentations in lab meetings. It is notable that Dr. Rosinbum's colleague (professional peers), Fatima Abbasi, failed to attend multiple lab meetings including one where she did not show up to the lab meeting that she was scheduled to present at, and Johnny Lam did not attend two lab meetings. Dr. Sung herself cancelled a scheduled presentation at a Branch meeting at the last minute, although the presentation had been scheduled two weeks in advance. To Plaintiff's knowledge and belief, none of those employees were not marked down or criticized in their PMAP evaluations, yet Dr. Rosinbum was severely criticized and her performance downgraded in part large part based on this inaccurate criticism.

21. Later that year Dr. Sung and Dr. Bauer inexplicably omitted Dr. Rosinbum's research activities in the Annual Report written about the lab's work. Dr. Rosinbum asked Dr. Sung to share Sung Laboratory Annual Report during the period it was being prepared. Dr. Sung refused to share it, which is very unusual, since the document is a public one, not considered private. Dr. Rosinbum had never had a P.I. refuse to share a draft annual report prior to this. This was a different practice than Dr. Rosinbum had ever encountered before. Dr. Rosinbum had always prepared the section which included her work for annual report for her PI as many other researchers did in the division.

22. In the period leading up to January, 2014, Dr. Malcolm Moos, Dr. Rosinbum's previous PI, had delayed writing Dr. Rosinbum's research paper (she had been working on for 4 years, and research of the project was completed on August, 2013), and when he did submit it, he wrote the paper in a way that intended to bring a denial by Dr. Puri for publication approval. This was an intentional act to further interfere with Dr. Rosinbum's career. The fact that Dr. Rosinbum's research was not being published was held against her in her PMAP. Further, publication of scientific papers is a critical component for obtaining a permanent position. Dr.

Moos, and Dr. Bauer caused this delay, which directly jeopardized her ability to convert to a permanent staff position in the FDA.

23. On or about May, 2016, Dr. Kyung Sung intentionally failed to invite Dr. Rosinbum to career-advancing training and meetings, despite Dr. Rosinbum, Asian, male coworker, (Johnny Lam) being invited to attend those meetings. Additionally, Dr. Sung maintains a closed door policy since she started to work in OCGT. Dr. Rosinbum was told that if she needed to talk with Dr. Sung, she needed to make an appointment. However, that was not the case with Johnny Lam as Dr. Sung had frequent casual meetings with him, without any appointment being needed.

24. On or about July 27, 2016, Dr. Steven Bauer issued Dr. Rosinbum an inaccurate and downgraded Performance Management Appraisal Program (PMAP) rating without seeing/ reviewing her work. The rating downgraded her performance based on the inaccurate reports from Dr. Sung, and cited her failure to meet standards. These failures however, were the direct result of management actions interfering or preventing her from completing her work and meeting the standards, such as isolating and refusing to give her meaningful work assignments, refusing to review and evaluate her written work for publication, and other tactics specifically designed to create a false record of her performance to justify her retaliatory removal.

25. In early June 2016 division secretary Susan Roman disclosed to another employee, Dr. Varadkar that the decision not to retain Dr. Rosinbum had been made a month before the performance review.

26. In August and September, 2016, Dr. Rosinbum heard from two separate employees that Dr. Sung had told them that prior to Dr. Sung being hired, senior managers (Dr. Bauer and Puri) had made the decision that Dr. Rosinbum would not be converted from Fellow to a full-time permanent employee status. Dr. Sung stated that the decision was based on Dr. Rosinbum

having reported Dr. Moos' sexual harassment conduct.   Therefore, the PMAP was not based on actual performance or productivity, but rather was designed to create a pretext for the decision to remove her.

27.  On or about August 4, 2016, Dr. Steven Bauer informed Dr. Rosinbum that she would not be converted to the competitive service at the end of her 7-year fellowship.  This despite Dr. Rosinbum having been granted an advisory approval by the Site Visit Committee for being hired. Dr. Rosinbum had presented to the Site visit committee (a panel of scientists from academia and outside the agency).  They reviewed Dr. Rosinbum's performance on November 19, 2015, and recommended she be converted to GS-13 Staff Scientist position in their report on March 21, 2016.

### COUNT 1

**Religious Discrimination and Retaliation in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq**.

28.  Plaintiff re-alleges paragraphs numbered 1-27 above.

29.  The plaintiff was treated in a discriminatory manner because of her religion, in violation of 42 U.S.C. § 2000e, et seq., when:  while he was her first-line supervisor in the workplace, Dr. Moos made repeated negative comments about the Muslim Religion; asked Dr. Rosinbum why Muslims did not apologize to the United States for terrorism; and other clearly derogatory and accusatory and judgmental comments about her religion.

30.  This discriminatory view effected Dr. Moos's supervision of Dr. Rosinbum, and prohibited her from advancing in her career, or publishing her scientific research when he delayed required supervisory input and approval on her research publications.  When he

unilaterally dismantled her workstation and placed it in the hallway, he deliberately and with retaliatory malice caused her severe stress and emotional harm, in addition to damage to her reputation and standing among her colleagues and in her profession.

31. These acts were also retaliatory, for her complaints about Dr. Moos to his superiors in April *2014*. They were intended to, and did, create the pretext for her removal in November 2016.

## COUNT 2

### Sex Discrimination and Retaliation in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.

32. Plaintiff re-alleges paragraphs numbered 1-31 above.

33. The plaintiff was treated in a discriminatory manner because of her sex, in violation of 42 U.S.C. § 2000e, et seq., when; while he was her first-line supervisor in the workplace, Dr. Moos made repeated sexual and romantic advances to her with the intent of developing a personal and sexual relationship; when he advised her not to become pregnant while working in his lab; when he developed a relationship with another female colleague and together they engaged in inappropriate sexual conduct in the workplace; when he repeatedly invited Dr. Rosinbum to non-work related weekend retreats and personal growth seminars; when he made sexual advances to her while in his hotel room on out-of-town travel; when he made derogatory comments about her appearance in front of other staff and other acts clearly based on her sex.

34. This discriminatory attitude, and the conduct of making unwanted and uninvited sexual advances against his subordinate employee which were re-buffed, effected Dr. Moos's supervision of Dr. Rosinbum. It created a hostile work environment for her. It also directly prohibited her from advancing in her career, or publishing her scientific research when Dr. Moos

delayed required supervisory input and approval on her research publications.  When he unilaterally dismantled her workstation and placed it in the hallway, when he made derogatory comments about her appearance, when he criticized her professional performance unjustly, he deliberately and with retaliatory malice caused her severe stress and emotional harm, in addition to damage to her reputation and standing among her colleagues and in her profession.

35.  These acts were also retaliatory, for her protesting response that a sexual relationship was inappropriate in the work setting, and her refusal to engage in a sexual relationship with him, and for her complaints about Dr. Moos to his superiors in April 2016.  They were intended to, and did, create the pretext for her removal in November, 2017.

### COUNT 3
### Retaliation in Violation of Title VII of
### the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.

36.  Plaintiff re-alleges paragraphs numbered 1-35 above.

37.  Dr. Puri, Dr. Bauer, and Dr, Sung retaliated against Dr. Rosinbum for her complaints of sexual harassment against Dr. Moos, when: they refused to take appropriate action in response to her complaints to stop the harassment and isolation perpetrated by Dr. Moos; they failed to provide her adequate and appropriate work assignments and supervision following her ejection for Dr. Moos' lab; they continued and abetted Dr. Moos' sabotage of Dr. Rosinbum's efforts to publish her research; they lowered her performance rating; they refused to convert her to a permanent position, and instead removed her.

### REQUESTS FOR RELIEF

38.  Wherefore, Plaintiff requests the following relief be granted for both Counts above:

Plaintiff be instated to the permanent Staff position she competed for, was recommended-for by the Site Visit Committee, but was denied, and instead was removed, with back pay and benefits from the date of her removal;

Compensatory damages in the amount of $1,000,000.00 for injury to the Plaintiff, including but not limited to injury to her professional reputation and standing, mental health and well being, physical health and well being, career and income potential;

Reimbursement of expenses and costs including all costs, expenses and disbursements necessary to pursue this action, including reasonable attorney fees;

All other relief which law and equity may provide ,

## JURY DEMAND

39. Plaintiff requests a trial by jury for all issues so triable.

Respectfully Submitted:

_____

F. Douglas Hartnett
DC Bar 466851
Elitok and Hartnett at Law, L.L.C.
1101 - 30th Street, NW, Suite 500
Washington, DC 20007
dhartnett@elitokandhartnett.com
(202) 965-0529 (vox)
(202) 965 0530 (fax)
*Counsel for Plaintiff*